Good morning. We have a number of oral arguments this morning, but first order of business are some motions to the court. And first I'd like to turn it over to our colleague, Judge Lin. Thank you very much. It is my pleasure this morning to be here. I've known Mr. Kazan quite well, having worked closely with him for the past year as my law clerk. And based on my firsthand experience with him, I am thoroughly convinced he has all the necessary qualifications and character to be an outstanding member of this bar. He's contributed to the work of my chambers and to the work of this court. And for that reason, I am pleased to formally move the admission of Daniel Kazan, who's a member of the bar and is in good standing with the highest courts of California and the District of Columbia. I have knowledge of his credentials and am satisfied that he possesses the necessary qualifications. Do you concur? Yes. Then it's unanimous. The motion is granted. Mr. Kazan, congratulations. We have one more motion. Judge Hughes? I also have an admission for my clerk, Jose Restio, who has been with me for almost two years and started shortly after I did. So we have almost identical experience as a clerk. He's been a tremendous clerk for many reasons and has really helped me transition from my former career to the bench. And so I appreciate everything he's done. And so I move the admission of Jose Restio, who is a member of the bar and is in good standing with the highest courts of Virginia and the District of Columbia. I have knowledge of his credentials and am satisfied that he possesses the necessary qualifications. Thank you. Judge Lynn? Okay. Thank you, Judge Hughes. The motion is granted. I congratulate both Mr. Restio and Mr. Kazan. Could you both please stand and face the clerk of the court. Welcome to the bar. Welcome. All right. We have three patent cases that are going to be argued today. The first one is Appeal Number 2014-1838, Avenir Pharmaceuticals, Incorporated versus Parr Pharmaceutical, Incorporated. Ms. Carlin? You've reserved three minutes for rebuttal? Yes. I'm reserving three minutes, please. Okay. Whenever you're ready. Good morning. My name is Janine Carlin, and I represent the appellate, Parr Pharmaceuticals. May it please the court. The central question here today is, is 10-30 range less than 150? The district court found that it is not, and that is clear error. The district court found that the prior art does not disclose 10-30 milligrams of quinidine when the prior art reference of the 053 application discloses an encompassing range of 150 milligrams or less. Are you referring to Claim 7? I'm referring to a disclosure in two places in the 053 application. It is in Claim 7, and it's also in another location in the reference at Appendix 19168-69, where it specifically discloses that the applicant believed that 150 milligrams or less of quinidine would work. Did it ever suggest that zero quinidine would work? It suggested a range of less than 150, but of course, when the invention is, or the application is to a combination of quinidine with dextromethorphan, so there would be no opportunity to have zero quinidine. Right. I'm just trying to look for references that specifically said anything below the number of 50 milligrams of quinidine that would be helpful and useful or therapeutically effective for PBA. So what in the 053 application specifically says something below 50? In the 053 application, there's a suggestion, a belief, the applicant says, that you could go less than 150 milligrams, and he has a such as, an example, 50. He doesn't say anywhere, and no prior art says that 50 is a floor. No prior art says that you should not go less. So no prior art specifically says you can go below 50 either, does it? There are. Not just the 053 application that has the encompassing range of 150 milligrams or less, but also the Yacatan poster. Now the Yacatan poster is where they file the application, and within that study, there is a chart that shows a lot of lower doses of quinidine, including doses within the claimed range. 20 milligrams, for example, was able to provide enough dextromethorphan in six out of seven individuals, more than 80 percent. And that reference... What part of the Yacatan reference said that? The reference at A19100 has a chart that explains how you can go lower, lower doses of quinidine, and within that same reference, there is discussion that the purpose of quinidine, or the goal of the study that they were doing, was to find the minimal amount, the minimal amount of quinidine that could sustain therapeutic levels in the blood. That's again at A19100. Right, and the judge below determined that, has made a fact finding, that one of ordinary skill in the art at the time this nanograms per milliliter, or whatever the units were, of the DM in the person's bloodstream, right? The court made that finding, and it is one of the errors of the court, but when you look at the prior art as a whole, you'll see that that's incorrect. For example, in the Yacatan poster, you see that at that level of 20 milligrams of quinidine, the patient, the volunteers, the people who took the drug, had a blood level of something in the 60 percent, 60 nanograms per milliliter range, and that showed that more than 80 percent of the folks were able to have enough dextromethorphan in their blood to be therapeutic. That's assuming that 60 is high enough, that people of ordinary skill in the art back in 2002 believed that 63 was enough, was a high enough amount in the blood. That's what the prior art shows. But the district court found otherwise, and now we have to ask ourselves, why was that finding clearly erroneous when there seemed to be testimony from all the doctors that testified that people understood at that time that you needed 100 nanograms in the bloodstream? Well, we do have some of the references, some of the sites that the court looked to were Avenir's own subjective belief, which should not be considered here. But also, it was based on testimony. First of all, experts did say that they would look to the prior art such as the 248 example and also the Yacatan poster, which shows that these blood levels. The testimony of Avenir's expert, which said we'd look at 100 nanograms per milliliter, is not something that's supported anywhere in the references. You have one reference, the Smith's abstract, that has a range, an average range, which means it could be less than 100 nanograms per milliliter. And then you have other prior art, such as the 248 patent and the Yacatan poster, showing lower blood levels. But really, the point here of quinidine is to work to, it's not the active ingredient here. Dextromethorphan is the active ingredient. And quinidine is what makes the dextromethorphan available. And you have the teachings of the Yacatan poster, which shows even down to 5 milligrams of quinidine per day, people were able to get an effect in their blood of dextromethorphan. And that, the Yacatan poster teaches, that's what you're looking for, to be therapeutic. What if we were to conclude that it was not clearly erroneous for the district court to find that one of ordinary skill in the art back in 2002 expected that you needed, the therapeutic amount was 100 nanograms per milliliter in the blood. Would you lose? No. Because? There are two reasons. One is that under Galderma, looking at the 053 application, you look at whether the range that's claimed is within the encompassing range. And we have an encompassing range of 150 milligrams or less. So can you point to me in that patent where it says that it can be anywhere from 0 to 150? It's in the 053 application. It says less than 150 milligrams is believed to work. But that's not a range. A range is 10 to 150 or 5 to 150. Less than 150 isn't the kind of range that it is. It is an encompassing range situation, where you have a range of 150 down to an amount that will work, which is not zero. And claim seven is the same situation, and that's not to exceed 150 milligrams. What did the district, I'm sorry. No, go ahead. What did the district court say about claim seven? The district court said nothing about claim seven. Why is that? Because it wasn't it was not discussed specifically at trial. Now, the reason is we have the same disclosure of the 150 milligram range below in another place in the 053 application. And we had testimony on it. We had a claim chart on it. Is it the same kind of disclosure though? It's up to 150 or 150 or less? It's slightly different language, but it's basically the same concept. 150 milligrams or less of quinidine. It just doesn't seem to me that that's clear enough to actually disclose the range. I mean, it doesn't say anything about what the lower end is, and it leaves, you know, the public to guess at what might be an effective range. In this case, you have a range from 150 down to it can't be zero. And here we have one of ordinary skill in the art, of course, would know that that can't be zero. And so your range is something a little... Well, how do you know it can't be? I mean, we know for this particular drug combination, it can't be zero because you need the cue to come around. Exactly. But I can see if we establish a rule that 150 or less or a number or less is a sufficient range that if somebody, you know, decides that you don't need the second drug at all, that they're going to say 150 or less includes zero. And that seems like, you know, it just, it kind of doesn't cabin the way we look at disclosures. Now, in this case, it's taught throughout the O5-3 application and through the other prior art that quinidine, the whole purpose of it is to make the dextromethorphan available in the blood. If you didn't have quinidine and it's taught throughout this prior art, then the dextromethorphan goes away very quickly. But to me, it sounds like you're saying that then we have to understand the range 150 or less as one would have understood at the time to be what would have been an effective dose. And at the time, everybody thought that 150 or more was the effective dose. That's, first, that's not the standard of Galderma where you have an encompassing range. The range is there and then the claimed range is within it. And then after that, it's the avenue must come forward for secondary considerations to show that range of 10 to 30 is critical or special. Why wouldn't the range in the O5-3 be arguably 50 to 150 when it says in the reference, dosages of only 150 milligrams per day are effective in increasing VM concentrations. And it is believed by the applicant that even lower dosages, parenthetical, such as 50 milligrams per day, closed parenthetical, will be effective in at least some patients. So, you know, it's a little equivocal about the 50 number, but it suggests that maybe 50 is going to work for some people. The applicant believed, that's strong language, that 150 milligrams less than that would work in patients. Just such as 50 is an example, but it is not a floor. And nowhere in the reference is there any suggestion that there is a floor, that there is a 50 is it, or that you can't go lower. And so under Galderma, I mean, it's... But there's no suggestion in the reference either that things less than 50 might be expected to work. The suggestion is within the language of applicant believed this would work, and it's a range. But again, under the Galderma framework... Applicant believed that 50 would work. I'm sorry? Applicant believed that 50 would work. Applicant believed that 150 or less would work, and 50 was an example, such as 50. There's nowhere to suggest anything below 50. There is. Other than... The range is themselves. Less than. The range is themselves, yes. So you think the reference teaches... Obviously, it teaches more than zero. It teaches more than zero, yes. One? It could be one, and I'm in my rebuttal time. Really? So... Okay, let's hear from the other side. Mr. Cerrito? Am I pronouncing that right? Yes, Your Honor, you are. Thank you. Okay. May it please the Court, Dominic Cerrito, Quinn Emanuel, or Martin Sullivan, on behalf of Avenir. Your Honors went right to the point. 053 discloses, at best, 50 MIGs per day of quantity. How do we know that? Every expert in this case stated that. Not just Avenir's experts, PAR's experts. They certainly could have looked at Claim 7 and said other words. They chose not to. They could have looked at the disclosure of 053 application and said other words. They chose not to. The Court's finding on this is therefore not clearly erroneous. It hasn't been challenged. Their own experts, time and time again, Dr. Paulson said, and I quote, 053 application teaches that dose is lower than 150, and it's speculated that even maybe, even maybe, down to 50 milligrams a day will likely be effective. Never said anything less than that. And they had the opportunity, and they failed to do so. Notwithstanding the fact that Claim 7, of course, was not discussed at all, not a single word of testimony from any party on that claim. Again, when they, I assume, when their experts reviewed that reference, they reviewed the entire reference, and for what it disclosed, they said 50 milligrams a day. With regard to the Yakutam poster that was pointed out by my adversary, the Yakutam poster is a PK study, has no efficacy data in it. While we heard the word efficacious, effective quite a few times, it has nothing to do with treating PBA. It's simply to determine how much of the drug would get into the blood at various levels. But people knew at the time that converting people to an effective metabolizer, to a poor metabolizer, was a key element to having therapeutic efficacy with DM, right?  Key element, it was an element, but it showed nothing as to efficacy. If you were an effective metabolizer, then you were very unlikely to be getting an effective treatment of DM, right? I would agree with the word unlikely, yes. Okay, so, and then the Yakutam reference does talk about one place, one data point, about how 20 milligrams of Q, quinidine, was sufficient to convert several people from an effective metabolizer to a poor metabolizer. That's correct. Thereby creating a pathway for the DM dosage to go straight to the bloodstream. Yes. That would be the logical conclusion once you become a poor metabolizer, right? But it says nothing about efficacy, whether that will work to treat, certainly at the levels discovered at that 20 mg dose. There's no evidence. And again, PARS experts never said at the time, person who is ordained in Skolniak looking at that evidence, would have concluded that this would have been an efficacious treatment. In fact, they went further. They said that there's no correlation, no PK, how much drug is in your blood, PD correlation, PD is whether it's efficacious or not. Their experts testified there's no correlation whatsoever. So a PK study is nice and you can learn some data from it, but it says nothing about efficacy. And let's look what happened in the real world. Even if we could extrapolate from that study to disclose a range, given that this is a factual finding, if there's other evidence going the other way, would that make it clearly erroneous? Do you have any courts finding? I didn't phrase that very clearly. Let's assume the Yakutin art shows the range sought. It shows the range sought. Does that make the district court's factual finding clearly erroneous? Absolutely not, Your Honor. The findings that have not been challenged, ultimately was that you needed 100 nanograms per milliliter to get efficacious treatment. And what we look at with regard to the X-GAM posters, I believe the number is 60 or 63, I think was the actual number. If you look at each and every other piece of data that you have from the Smith abstract, when they actually dose patients to see efficacious treatment, all 12 of those patients had more than 100 nanograms per milliliter. So that's what the art talked about, and that's what the judge found. Then there's the example two of the 0248 patent, right? Where there was a patient that had something less than 60, something like 50 nanograms, and it appeared to work for that particular patient. Yes, that was the allegation. So isn't that an indicator that you don't need 100 nanograms in the blood? No, Your Honor. 50 would work because it actually did work? Well, what actually did work was a dose of 60, 150. So a maximum inhibiting dose of... Yeah, I'm not talking about the dosage. I'm talking about the amount that's in the blood. So, Your Honor, there were findings effect on that as well, which remain unchallenged and not shown to be clearly erroneous. Those findings were that that particular example was discredited. That one skilled ER would not rely on it because of the faults in the example. Also, the district court found that you wouldn't just look at that one example and ignore all the rest of the evidence, including other evidence that was supplied in the 0248 reference. For example, example three. Example three, the next example shows much higher blood levels. That was also found by finding a fact by the judge and expert testimony that was much more reliable because it took out placebo effect, all the other issues that we had with example two were not present in example three. What were those other problems? I mean, we're talking about two examples in the same patent. Why is one something that we should just kick to the curb and the other one is terrific and we should embrace it? Your Honor, there was expert testimony concerning example three where they started and stopped the patient's treatment. Not my testimony, the expert testimony, that that takes out the placebo effect of the potential of the drug. That was credited by the district court over the objections of PARS experts. That's a finding that hasn't been disputed and it's not clearly erroneous. When it comes to the actual example itself, example two, remember these are case studies, so they're not run exactly the same way. It's two different patients treated two different ways. The court found, example two does not disclose when the blood samples were drawn or how or where they were stored or the patient had reached a steady state level of DM and even if he had, whether his blood levels were measured at C-max or TROF levels and the patient's medical history pre-predosing. So there were findings that were undisturbed by PARS. Did we have all that information for the patient in example three? We have more of that information for example three. Again, some of it, not all of it. Yes, Your Honor. Well, let's not just talk about example three. Let's talk about all the evidence because one skill in the art would presume to have looked at all the evidence and you have to look at the Smith abstract also. That is 12 patients who showed efficacious treatment. All 12 patients had over 100 nanograms per milliliter. So if you want to talk about just efficacy, you have a total population of efficacy of 14 patients, 13 of which had over 100 nanograms per milliliter. The court found, as the expert specified, one skill in the art would look to the weight of the evidence. They wouldn't take the one over the 13. It would make no sense. And common sense I know creeps into these once in a while but that makes sense even to me. So at the end of the day, the Yat-Ka-Tan poster was nothing more than a PK study. And if we want to talk about the real world experience, Your Honor, what was done with that Yat-Ka-Tan evidence in the 20 minutes? It wasn't carried forward into the clinic. It was rejected. What they carried forward in the clinic was a 60-60 dose, the 60 being also a maximally inhibiting dose. Why? Because again, to get the higher blood levels. So the real world showed that the 60-20 didn't play a part of going forward. It was a data point that didn't factor going forward with regard to clinical work. Just so I understand your invention, which is using 40-20 or 20-10, you're not suggesting you get a better therapeutic effect with those lower doses than 60-150, right? Your invention is the discovery that a lower dosage gets you the equivalent therapeutic effect? The word that was used by the experts, comparable. Comparable. Comparable efficacy. But it's not just our invention. It's comparable efficacy with better safety results. And also, it's treating the entire claim elements. We're treating PVA at those particular dosages at a particular weight-to-weight ratio, which we've heard nothing from the comments about weight-to-weight ratios, because that appears nowhere in the arts. Those particular ratios don't appear. And so the comparable efficacy was achieved at sub-maximally inhibiting doses, which was surprising, and better safety. The better safety came in that if you metabolize the DM2 quickly, it produces a byproduct, a metabolic byproduct called dextrofan. We use DX for short. And that was a problem. The more dextrofan you had accumulating, the bigger problem side effects you had. By doing it this way, we were surprised to find that you didn't have that accumulation, that you weren't getting those side effects. So it's a multi-phase approach as to not just comparable efficacy, but also improved safety. With regard to Galderma, I think it's quite clear that there is no range case here, because there is no range that encompasses our invention. There's just simply no number in any patent, any prior disclosure encompassing the claim's dosage range. When you look at the reference, the 053 reference in particular, the word less than was used a number of times. The words less than never appear in the claim or in the disclosure. The claim talks about not exceeding, and some of the other quotations that were referred to talk about that perhaps a lower dose, such as 50, will be used. But it never says less than. And again, Your Honor, the disposal of evidence here, unchallenged evidence here, by all experts, is that at best, that disclosure goes down to 50. It doesn't go below that. Therefore, we do not have encompassing range. Therefore, Galderma does not apply. Your Honor, at the end of the day, this is a six-day bench trial.  analyzing all the evidence presented in the trial, including both the credibility experts presented by both sides. The district court held that Parr failed to show, by clear and convincing evidence, that either the 053 application or the priority as a whole renders the 282 and 484 patents obvious. Parr failed to show that there was a problem to be solved below. As Your Honor pointed out, there was a 6150 formulation already existed. It worked fine. There was no problem that had to be solved. Parr also failed to show there was any motivation to combine, modify the priority in the way that it suggests. The reality is, Parr's entire case below was about the use of hindsight. That's the only way you can look at example two and say, that's something I should be worried about. That's the only way. Because you have to try to retrofit that example into the invention you know that already exists. That's called hindsight. Parr seeks to do a do-over here, if you will, Your Honor, and seeks this court to essentially ask this court for a review anew of the factual record below. While that's clearly improper, Parr compounds the problem by asking this court to accept lawyer argument over the testimony of a skilled artist and a person of ordinary skill at the time of the invention. This is, of course, required by Parr since it raises arguments that were never even raised below, including claim seven. As Your Honor is aware, the standard of review  They have to show clear ear in the district court's findings. We find little more than lip service to that effect. The initial consideration of evidence is not the appellate role. This court has rejected finding clear ear based on a reference that was, quote, placed in the record by the district court but was not the subject of testimony or any other form of evaluation by that court. And that is ADH Robertson v. United States Steel Deck, 820 Fred 2nd, 348-389. Again, unsubstantiated attorney argument regarding the meaning of technical evidence. Again, we heard that. We saw that in the briefs with regard to what claim seven and what the 053 patent means. It is no substitute for competent, substantiated expert testimony. It should give it no weight on appeal. I will just address quickly, Your Honor, the secondary considerations here. I think they both, both through unexpected results and teaching away, there's no challenge to the facts on the teaching away issue here, Your Honor. I think it was clear as testified and found by the court that all the art was directing this towards maximal inhibition. There was no discussion, no evidence, no reference that showed less than maximal inhibition to treat this disease. I think the prior taught away. There, with regard to unexpected results, again, Your Honor, we said it a moment ago. It was unexpected that you could treat this disease with comparable efficacy at a dose lower than maximal inhibition and still receive a safety profile that was not as comparable, but was better. That was a surprise. We've not seen this before. Your Honor, there's also secondary considerations that are in effect here. Obviously, with regard to commercial success, there was not a challenge to either the numbers or the nexus, not a single word dedicated to challenging those, those stand unrebutted. The only argument there was a blocking patent argument, which, quite frankly, Your Honor, it doesn't make a lot of sense in this context because the patent at issue, the 248 patent, expired one year after the launch. Before you run out of time, I did have one more question. Yes, Your Honor. This claim covers ratios of 20-10, 40-20, but as I understand it, your client didn't actually run tests on whether those worked until several years after the patent application was filed. That's correct, Your Honor. When they took the 60-60 formulation that we mentioned earlier into the clinic, the results were so robust, beyond anything they could have thought of, that they then came up with the invention of lowering it even further. It was eventually proved out later in subsequent testing. OK. There's no written description case in front of us now, right? No.  OK. Thank you. Thank you, Your Honor. All right. Ms. Carlin. Thank you, Your Honor. First, I'd like to start with the notion that every expert said that this 50 milligrams was a floor, and that is not true. We have our expert, Dr. Polson, who did not say it was speculated. He actually said stipulated that it could be lower than 50. Less than 150 milligrams. He said in many pages of testimony that he explained the 053 application, and that can be shown at the appendix of A15785 through 86, that this range is disclosed within the less than 150. So it is not true that all experts said that. The only thing Dr. Polson did say is that 150 milligrams is not a floor. So the other thing I need to point out is that TAR does challenge factual findings, as you can see from our briefing. And second, with respect to example two. Example two, I wanted to address the issue of it being disregarded by the court by some sort of theory that maybe it's not enabled. But this is a 103 case. And example two can be seen by one of ordinary skill in the art, and can be read for what it discloses. And in fact, our expert stated that that example should work, and so should the others. But in this case, that reference, the 248 patent, is looked at as a whole, and for all that it teaches. Also, I wanted to address the fact that the court had a 63-page opinion. But it's interesting that there were only six lines of findings of fact on the 053 application. And the expert for Avenir only had about four sentences in his direct testimony on this 053 application. Turning to teaching away, we of course do challenge that on a number of grounds. But one of the issues with teaching away is that absolutely no piece of prior art shows that you should not go below a certain amount. There's no teaching away. There's no criticism. There's nothing in the references that say, do not do this. That cannot be, therefore, a teaching away. With respect to unexpected results, again, taking a look at the Yakutian reference, the poster, it does tell that in a dose of 20 milligrams of quinidine part A that one would expect to have enough DM in the blood to be therapeutic. So this is not unexpected. It was shown that it should work. And we believe that the patents in suit are obvious over both galderma framework and with respect to the prior art as a whole. And no secondary considerations overcome. OK. Thank you, Your Honor. Thank you, Ms. Carlin. The case is submitted.